**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE,<br>5100 Wisconsin Avenue, NW, Suite 400<br>Washington, DC 20016<br><br>Plaintiff<br><br>v.<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>and<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE<br>Jamie Whitten Building<br>1400 Independence Avenue, SW<br>Washington, DC 20250,<br><br>Defendants. | Case No. |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

1. Plaintiff brings this action under the Administrative Procedure Act (“APA”), 5 U.S.C. § 706, against the United States Department of Agriculture (“USDA”) and the Department of Health and Human Services (“HHS”). Defendants, through a procedural bait and switch, unlawfully disregarded basic Federal Advisory Committee Act (“FACA”) requirements, and, in turn, put the health of Americans at risk, all in the service of special interests.

2. Since 1980, Defendants have jointly published new Dietary Guidelines for Americans ("Dietary Guidelines") every five years.

3. In January 2023, consistent with FACA requirements, and after public notice and a published request for advisory committee applicants, Defendants established the Dietary Guidelines Advisory Committee ("DGAC") for the 2025–2030 edition of the Dietary Guidelines.

4. After a lengthy and transparent public process, including nearly two years of open hearings and thousands of public comments, the DGAC's 20 independent nutrition experts issued the DGAC's findings in the *Scientific Report of the 2025 Dietary Guidelines Advisory Committee* ("DGAC Report").

5. But instead of issuing Dietary Guidelines based on an internal review of the DGAC Report as had been the longstanding practice, Defendants, without any oversight or public input, hastily assembled a handpicked panel of meat, dairy, and fad diet industry insiders ("Secret Panel") for the purpose of attacking the FACA-compliant DGAC Report and creating a substantially altered report entitled *The Scientific Foundation for the Dietary Guidelines for Americans, 2025–2030* ("Foundation for the Dietary Guidelines").

6. Although Defendants had previously vowed to "toss out the people who were writing the guidelines with conflicts of interest," Defendants assembled a Secret Panel that was rife with conflicts of interest, as demonstrated in the "Disclosure of Nutrition-Related Private Interests" section of the Foundation for the Dietary Guidelines.

7. Citing the Secret Panel's haphazard, unscientific claims as "the evidentiary foundation for the 2025 Dietary Guidelines for Americans," Defendants then published Dietary Guidelines that are not based on the preponderance of scientific evidence and instead embrace saturated fats, halve the recommended fruit and vegetable servings, remove daily alcohol intake limits, and promote fad diets for use as medical treatment for "individuals with certain chronic diseases."

8. The 2025–2030 Dietary Guidelines pose dangers to children, whose school food programs must adhere to the Dietary Guidelines; to individuals with medical conditions who might follow the baseless medical advice incorporated into the Dietary Guidelines; and to Americans who are at risk for diet-related diseases, including obesity, diabetes, and cardiovascular disease, and might follow the scientifically unfounded Dietary Guidelines, which are designed to promote fatty, high-cholesterol products of industries with which the Dietary Guidelines' authors are affiliated.

9. Defendants' reliance on industry insiders' non-FACA-compliant review of the FACA-compliant DGAC Report is arbitrary and capricious.

## JURISDICTION AND VENUE

10. This action arises under the laws of the United States, including the FACA, the APA, and the Constitution. This Court has subject matter jurisdiction under 28 U.S.C. section 1331.

11. Plaintiff seeks relief against federal agencies carrying out official activities. The United States has waived sovereign immunity for the relief sought in this action under 5 U.S.C. section 702.

12. This Court is authorized to "hold unlawful and set aside" agency action and to "compel agency action unlawfully withheld or unreasonably delayed" under the APA, 5 U.S.C. sections 702, 706.

13. Plaintiff also seeks declaratory relief under the Declaratory Judgment Act, 28 U.S.C. sections 2201–2202.

14. With regard to the mandamus relief sought compelling performance of nondiscretionary statutory duties, this Court has jurisdiction under 28 U.S.C. section 1361.

15. Venue is proper in this District under 28 U.S.C. section 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Defendants' failure to provide notice, access to meetings, and related records to Plaintiff and its members in this District, as well as Defendants' promotion and implementation of the challenged actions through federal food, nutrition, and health programs that operate in this District.

16. Venue is also proper under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff resides in this District within the meaning of 28 U.S.C. § 1391(c)(2) in that it maintains its headquarters, conducts ongoing organizational activities, and has members in this District and because this action does not involve real property.

17. Defendants are federal agencies and are subject to suit in this District for purposes of the relief sought here.

## PARTIES

18. Plaintiff ("Physicians Committee") is a nonprofit public health organization that advocates for preventive medicine through proper nutrition, encourages higher standards for ethics and effectiveness in medical research, and conducts clinical research on the relationships between food and disease. Established in 1985, Physicians Committee is a national organization representing approximately one million supporters, including 17,000 physicians, as well as other medical professionals, scientists, and laypersons.

19. Physicians Committee has monitored national nutrition policy since 1991, when the organization issued recommendations regarding USDA's Eating Right Pyramid, the food diagram that then interpreted and accompanied the Dietary Guidelines. For each edition of the Dietary Guidelines since then, Physicians Committee has scrutinized the establishment of the DGAC, participated in the public process that precedes each new edition, and examined the content of the subsequently published advisory committee report and revised Dietary Guidelines.

20. In 1999, Physicians Committee sued Defendants' Secretaries under federal open government laws, alleging improprieties in the establishment of the 2000 DGAC. A federal district court declared that the agencies had violated the FACA by failing to disclose advisory committee records in a timely manner, a critical issue as withholding advisory committee records makes it impossible to discern the scientific basis, if any, for committee recommendations. The court also agreed that USDA had violated the Freedom of Information Act ("FOIA") by hiding financial conflicts of interest. This was similarly

significant because conflicts of interest related to food policy can have profound effects on nutrition recommendations and the health of the public. Physicians Committee later sued the agencies to prompt the release of public records regarding the 2015 DGAC and the 2020 DGAC.

21. In the leadup to the publication of the 2025–2030 Dietary Guidelines, Physicians Committee submitted DGAC nominations, written comments, and oral comments to Defendants and attended Defendants' public meetings regarding the Dietary Guidelines.

22. Physicians Committee members who are laypersons are harmed by Defendants' conduct in that these members are misled by the Dietary Guidelines, which impair their health and their families' health. Physicians Committee members who are physicians are harmed by Defendants' conduct because the Dietary Guidelines impair the health of these physicians' patients and interfere with patient education and care, thereby hindering the ability of these physicians to accomplish their professional objectives of keeping their patients healthy.

23. Defendants' conduct harms Physicians Committee by compelling the organization to expend scarce resources to accomplish Defendants' statutory duty to inform Americans of dietary steps to protect their health. By neglecting their duty, Defendants have compelled the Physicians Committee to expend resources to counter Defendants' misinformation. One of Physicians Committee's principal organizational objectives, to which it has devoted extensive time and resources, is to publicize, both to its own members and the public at large, the benefits of proper nutrition. The Dietary

Guidelines impair the work of Physicians Committee and make it necessary for Physicians Committee to expend substantial time and resources—time and resources that normally would be devoted to other organizational initiatives—to inform the public of the conflicts of interest behind the Dietary Guidelines and that the Dietary Guidelines do not reflect sound public health advice as a result of those conflicts of interest.

24. Defendants are United States agencies within the meaning of 5 U.S.C. § 552(f)(1).

## LEGAL FRAMEWORK

### National Nutrition Monitoring and Related Research Act

25. In 1990, Congress passed the National Nutrition Monitoring and Related Research Act, which mandated that Defendants publish the Dietary Guidelines. Defendants' prior Dietary Guidelines were voluntary.

26. At least once every five years, Defendants "shall publish a report entitled Dietary Guidelines for Americans." 7 U.S.C. § 5341(a)(1).

27. "Each such report shall contain nutritional and dietary information and guidelines for the general public" that are "based on the preponderance of the scientific and medical knowledge which is current at the time the report is prepared." *Id.* § 5341(a)(1)–(2).

28. By statute, the Dietary Guidelines "shall be promoted by each Federal agency in carrying out any Federal food, nutrition, or health program." *Id.* § 5341(a)(1).

29. "Any Federal agency that proposes to issue any dietary guidance for the general population or identified population subgroups shall submit the text of such

guidance" to HHS and USDA, which then "shall review and approve or disapprove such guidance to assure that the guidance either is consistent with the 'Dietary Guidelines for Americans' or that the guidance is based on medical or new scientific knowledge which is determined to be valid by the Secretaries." *Id.* § 5341(b)(1)–(2).

30. In 2015, Congress set goals for developing Dietary Guidelines that "better prevent chronic disease, ensure nutritional sufficiency for all Americans" and "reflect balanced sound science" via an "advisory committee selection process" that is "improved to provide more transparency, eliminate bias, and include committee members with a range of viewpoints." Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 735(b) (2015).

**Federal Advisory Committee Act**

31. Congress passed the Federal Advisory Committee Act ("FACA") in 1972 "to counter the fear that committees would be dominated by representatives of industry and other special interest groups seeking to advance their own agendas." *See Heartwood, Inc. v. U.S. Forest Service*, 431 F. Supp. 2d 28, 33 (D.D.C. 2006) (citing *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999)).

32. The FACA defines an advisory committee as:

> any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof ... which is ... established or utilized by one or more agencies in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government and that is—
> **(i)** established by statute or reorganization plan;
> **(ii)** established or utilized by the President; or
> **(iii)** established or utilized by one or more agencies.

5 U.S.C. § 1001.

33. According to the FACA,

> An advisory committee shall not be established unless establishment is--
> **(1)** specifically authorized by statute or by the President; or
> **(2)** determined as a matter of formal record, by the head of the agency involved after consultation with the Administrator, with timely notice published in the Federal Register, to be in the public interest in connection with the performance of duties imposed on that agency by law.
> . . .
> **(1)** An advisory committee shall not meet or take any action until an advisory committee charter has been filed--
> **(A)** with the Administrator in the case of Presidential advisory committees; or
> **(B)** with--
> **(i)** the head of the agency to whom the advisory committee reports; and
> **(ii)** the standing committees of the Senate and House of Representatives having legislative jurisdiction over the agency to which the advisory committee reports.

*Id.* § 1008(a), (c).

34. The FACA further provides,

> **(a) Committee meetings.**--
> **(1) Open to public.**--Each advisory committee meeting shall be open to the public.
> **(2) Notice of meetings.**--Except when the President determines otherwise for reasons of national security, timely notice of each meeting shall be published in the Federal Register, and the Administrator shall prescribe regulations to provide for other types of public notice to insure that all interested persons are notified of each meeting in advance.
> **(3) Participation.**--Interested persons shall be permitted to attend, appear before, or file statements with any advisory committee, subject to such reasonable rules or regulations as the Administrator may prescribe.
> **(b) Public inspection and copying of records.**--Subject to section 552 of this title, the records, reports, transcripts,

> minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.
>
> **(c) Minutes.**--Detailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee. The accuracy of all minutes shall be certified by the chairman of the advisory committee.
>
> **(d) Closed sessions.**--Paragraphs (1) and (3) of subsection (a) shall not apply to any portion of an advisory committee meeting for which the President, or the head of the agency to which the advisory committee reports, determines that such portion of the meeting may be closed to the public in accordance with section 552b(c) of this title. Any such determination shall be in writing and shall contain the reasons for the determination. If such a determination is made, the advisory committee shall issue a report, at least annually, setting forth a summary of its activities and such related matters as would be informative to the public consistent with the policy of section 552(b) of this title.
>
> **(e) Designated officer or employee of Federal Government.**--There shall be designated an officer or employee of the Federal Government to chair or attend each meeting of each advisory committee. The officer or employee so designated is authorized, whenever the officer or employee determines it to be in the public interest, to adjourn any such meeting. An advisory committee shall not conduct any meeting in the absence of that designated officer or employee of the Federal Government.

*Id.* § 1009.

35. The government is required to make committee records available to the public as a matter of course unless a FOIA exception applies. *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992).

36. Under the FACA, advisory committees must "file a charter; announce their upcoming meetings in the Federal Register; hold their meetings in public; and keep detailed minutes of each meeting." *In re Cheney,* 406 F.3d 723, 727 (D.C. Cir. 2005).

37. A claim for document disclosure survives the termination of a FACA advisory committee, at least until all of the relevant materials have been disclosed. *Cummock v. Gore*, 180 F.3d 282, 292 (D.C. Cir. 1999).

38. An advisory committee must "be fairly balanced in terms of the points of view represented" and must "not be inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. § 1004.

39. Defendants' relevant statutory duties under the FACA are mandatory and ministerial:

> The court notes that nearly every provision of the FACA that explains the statutory duties of advisory committees, like those at issue here, includes the word "shall," *see, e.g.*, 5 U.S.C. app. 2 § 10(a)(1) (stating "[e]ach advisory committee meeting *shall* be open to the public) (emphasis added); *id.* § 10(b) (requiring that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee *shall* be available for public inspection") (emphasis added); *id.* § 10(c) (mandating that "[d]etailed minutes of each meeting of each advisory committee *shall* be kept") (emphasis added), indicating that "the language of [the FACA] leaves no room for discretion[.]"

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010) (emphasis and most alterations in original).

## STATEMENT OF FACTS

### ***DGACs have Operated under the FACA for Over Forty Years***

40. Since the 1980s, Congress has directed USDA and HHS to convene a Dietary Guidelines Advisory Committee.

41. At the direction of Congress, the first DGAC was established in 1983 in response to concerns that the 1980 Dietary Guidelines were not scientifically sound. Agata Dabrowska, Cong. Rsch. Serv., R44360, Dietary Guidelines for Americans: Frequently Asked Questions 2 (2016) (citing S. Rep. No. 96-1030 (1980)).

42. Prior to 2026, each of the ten DGACs had operated pursuant to the FACA.

***The 2025–2030 DGAC Complied with the FACA***

43. Like all previous such committees, the 2025–2030 DGAC was convened under and governed by the FACA.

44. Consistent with decades of past practice, on June 15, 2022, HHS announced in the Federal Register its intent to establish the DGAC in conjunction with a solicitation of applications for membership to the DGAC.

45. The charter for the DGAC was filed with Congress on December 9, 2022, and posted publicly on DietaryGuidelines.gov.

46. Prospective members went through extensive background checks on financial, ethical, legal, and criminal conflicts of interest, as well as annual ethics training.

47. Published Federal Register notices alerted the public to written comment collection and their right to provide oral comments.

48. The written public comment period opened on January 19, 2023, and remained open through October 7, 2024.

49. A document summarizing comments received and linking to the full text of written comments was provided to DGAC members throughout the process.

50. The DGAC met seven times.

51. All meetings of the DGAC were open to the public and were made accessible in person and by live webcast.

52. The DGAC conducted food pattern modeling analyses to ensure their recommendations applied at the individual level and when taken together across a full dietary pattern.

53. On December 10, 2024, the DGAC published the DGAC Report for public review and comment through February 10, 2025.

***The Secret Panel Failed to Comply with FACA***

54. With no notice to the public, Defendants afterwards handpicked a Secret Panel to serve as a substitute advisory committee to review the DGAC Report and, in a secret process without public participation, hastily create a substantially altered Foundation for the Dietary Guidelines, displeased that the DGAC Report had purportedly "framed its analysis through a health equity lens."

55. Defendants selected the Secret Panel members without public notice.

56. On information and belief, Defendants did not require Secret Panel members to undergo the recusal analysis, ethics training, or waiver process required for federal advisory committee members and Special Government Employees.

57. Of the nine members of the Secret Panel, eight had conflicts of interest:

- Ty Beal, PhD, a scientific advisory committee member for the food and agriculture project "Comprehensive and evidence-based global assessment of the contribution of livestock to food security, sustainable food systems, nutrition and healthy diets";
- Benjamin Bikman, PhD, co-owner of HLTH, a high-protein meal replacement brand with whey, egg whites, and hydrolyzed grass-fed collagen, as well as advisor for Nutrishus Brands, which sells high protein "Keto-certified products" made with milk protein;
- J. Thomas Brenna, PhD, who has declared financial relationships with Global Dairy Platform, National Cattlemen's Beef Association, North Dakota Beef Council, Texas Beef Council, General Mills, and American Dairy Science Association;
- Michael Goran, PhD, who has financial relationships with infant formula companies and Robert C. And Veronica Atkins Foundation;
- Donald Layman, PhD, FASN, who has financial relationships with National Cattlemen's Beef Association, National Dairy Council, and American Egg Board;
- Heather Leidy, PhD, FASN, who has financial relationships with National Cattlemen's Beef Association, Egg Nutrition Center, National Pork Board, General Mills, and Novo Nordisk;

- Ameer Taha, PhD, who has financial relationships with California Dairy and Dairy Management Inc.; and
- Jeff Volek, PhD, RD, a scientific advisor for Simply Good Foods who has financial relationships with National Dairy Council and Atkins Nutritionals.

58. More than half of the Secret Panel members also have relationships with organizations associated with USDA's checkoff programs, which promote food commodities without regard to their ill health effects and are statutorily prohibited from "influencing governmental policy or action" such as the Dietary Guidelines.

59. The Secret Panel failed to file a charter.

60. The Secret Panel operated with no opportunity for public participation or access.

61. The Secret Panel failed to provide notice of any meetings to the public.

62. The Secret Panel failed to provide any access to records that were made available to or prepared for or by the Secret Panel.

63. According to Defendants, prior to the Secret Panel's review of the DGAC Report, an unnamed "methodology expert" established unspecified "standardized protocols governing study inclusion and exclusion criteria, assessment of study quality and risk of bias, approaches to evidence synthesis, and criteria for grading the strength of evidence."

64. The Secret Panel took "only three months to produce its 90 page report and 418 page appendix" in secret, whereas the FACA-compliant public process

undertaken by the DGAC preceding the Secret Panel's activities spanned approximately 2 years and 8 months.

65. On information and belief, Defendants directed and controlled the Secret Panel's scope, timelines, and deliverables; approved the Secret Panel's membership and protocols; and accepted the Secret Panel's collective work product for the purpose of obtaining advice and recommendations to be used in finalizing the 2025–2030 Dietary Guidelines.

66. On information and belief, Defendants established and utilized the Secret Panel as a collective body to obtain advice and recommendations for the express purpose of re-evaluating and "correcting" the DGAC Report and supplying a substantially altered evidentiary foundation for the 2025–2030 Dietary Guidelines.

67. On information and belief, Defendants—through agency officials or contractors acting at their direction—(a) defined the scope of topics to be reviewed by the Secret Panel; (b) set timelines and deliverables for the Secret Panel; (c) controlled or approved the selection of Secret Panel members; (d) provided the Secret Panel with standardized protocols for inclusion/exclusion criteria, risk-of-bias assessment, and evidence synthesis; and (e) received, accepted, and relied on the Secret Panel's collective work product as their preferred "evidentiary foundation" in finalizing the Dietary Guidelines.

68. On information and belief, the Secret Panel had fixed membership, acted as a group, convened serially (in meetings or coordinated deliberations), and produced a

single integrated report reflecting collective judgments rather than independent individual submissions.

69. On January 7, 2026, Defendants simultaneously announced for the first time the Secret Panel's existence and published the Secret Panel's review of the DGAC Report as the Foundation for the Guidelines.

70. The Foundation for the Guidelines proclaimed that it "provide[d] a once-in-a-generation opportunity to start over," as a "new beginning," that "differs from previous U.S. guidelines in [] crucial ways."

71. The Secret Panel's Foundation for the Guidelines served as "the evidentiary foundation for the 2025 Dietary Guidelines for Americans," which Defendants also published simultaneously.

72. The Foundation for the Guidelines and, in turn, the Dietary Guidelines, rejected more than half—30 of 56—of the DGAC's recommendations.

73. Defendants boasted that "[t]hese Guidelines mark the most significant reset of federal nutrition policy in our nation's history."

74. As intended by Defendants, the Foundation for the Guidelines and, in turn, the 2025–2030 Dietary Guidelines, reflect the biases and interests of the Secret Panel members, whom they handpicked "through a federal contracting process."

75. For example, after interviewing Donald Layman, PhD, FASN, of the Secret Panel, the New York Times reported,

> Dr. Layman said that the health department contacted him and the other protein expert — Heather Leidy, an associate professor at the University of Texas at Austin — because it

> had already determined that reassessing protein recommendations was a priority.
>
> "The reason they reached out is because of my research — I mean, I'm known for publishing the higher-protein, lower-carb diets," he said. "My research literally mirrors the new dietary guidelines. They knew who I was."

76. The Foundation for the Guidelines and, in turn, the Dietary Guidelines instruct the public to increase consumption of meat, serving the interests of the National Cattlemen's Beef Association and other livestock industry entities with which Beal, Bikman, Brenna, Leyman, and Leidy are affiliated. The Foundation for the Guidelines and, in turn, the Dietary Guidelines reinforce this dangerous recommendation with exaggerated and erroneous statements regarding vegetarian and vegan diets, in marked contrast to scientific evidence and prior editions of the Dietary Guidelines.

77. Serving the interests of Brenna, Goran, Layman, Taha, and Volek, and in sharp contrast with medical science, the Foundation for the Guidelines, and, in turn, the Dietary Guidelines advise Americans to consume full-fat dairy products.

78. Although the Secret Panel included no physicians or medical experts and provided no supporting medical evidence, the Foundation for the Guidelines and, in turn the Dietary Guidelines, promote controversial "low-carbohydrate" Atkins-style diets for "individuals with certain chronic diseases," placing the weight of federal nutrition policy behind a particular medical treatment that advances the interests of Bikman, Goran, and Volek.

79. The Secret Panel's Foundation for the Guidelines did not involve comprehensive food pattern modeling, leading to internal contradictions in the Dietary

Guidelines. For example, if one follows the Dietary Guidelines' food servings recommendations, it is next to impossible to comply with the Dietary Guidelines' recommendation that one should consume less than 10 percent of calories from saturated fat.

80. Thus, the secret nature of both the Secret Panel and the Secret Panel's Foundation for the Guidelines precluded the public and unbiased scientists from flagging the aforementioned errors and deceptions prior to the publication of the Dietary Guidelines.

81. As one public health expert observed,

> [T]here has not been transparency in who wrote the new DGAs. Although there are documents included in the appendices by named scientists, there is no transparency in the methodology and rigor that was employed, or why certain topics were selected to be relitigated. The reviews themselves, as well as their overall presentation and integration, deviate significantly from the rigorous process that the HHS developed for the DGAs to ensure the evidence base and its committees' conclusions were replicable, unbiased, transparent, and free from non-scientific influences.

82. In light of the procedural deficiencies in the establishment and operation of the Secret Panel, as well as Defendants' disregard of the National Nutrition Monitoring and Related Research Act in publishing the Dietary Guidelines, Physicians Committee, on January 8, 2026, submitted to Defendants' Offices of Inspector General a petition requesting "withdraw[al of] the recently published *Dietary Guidelines for Americans, 2025–2030* and" issuance of "new Dietary Guidelines that are consistent with the *Scientific Report of the 2025 Dietary Guidelines Advisory Committee*."

83. Neither Office of Inspector General acknowledged or responded to this petition.

84. On April 27, 2026, in response to a statement in the Secret Panel's Foundation for the Guidelines that the "*Dietary Guidelines for Americans, 2025–2030*, are an invitation to all nutrition researchers to engage in continued scientific inquiry and dialogue to ensure the best possible diet is recommended for Americans," Physicians Committee met with Defendant HHS's Senior Advisor to propose corrective amendments to the 2025–2030 Dietary Guidelines.

85. Physicians Committee provided supporting evidence for its proposal, as well as follow-up correspondence, to Defendant HHS's Senior Advisor through June 2026, at which time Defendants had taken no action to address the significant deficiencies and biases reflected in the Dietary Guidelines.

86. Defendants have yet to take any action to address the significant deficiencies and biases reflected in the Dietary Guidelines.

## **PLAINTIFF'S FIRST CLAIM FOR RELIEF**
**(Violation of FACA via Improper Formation of Secret Panel; Agency Action Without Observance of Procedure Required by Law (APA § 706(2)(D)))**

87. Plaintiff realleges and incorporates by reference the preceding allegations.

88. The Administrative Procedure Act authorizes a reviewing court to hold unlawful and set aside agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

89. Defendants established the Secret Panel through the selection of "nutrition scientists and subject matter experts."

90. Defendants utilized the Secret Panel as a source of collective advice or recommendations for the Dietary Guidelines.

91. The Secret Panel had a fixed membership.

92. The Secret Panel had the specific purpose of "addressing and correcting" purported "deficiencies" in the DGAC Report, in turn "providing a once-in-a-generation opportunity to start over."

93. The Secret Panel, as a group, authored the *Scientific Foundation for the Dietary Guidelines for Americans, 2025–2030.*

94. The Secret Panel's members declared certain conflicts of interest in this document.

95. The Secret Panel was not composed wholly of full-time or permanent part-time federal employees.

96. Defendants' Secret Panel is a federal advisory committee subject to the FACA.

97. In establishing the Secret Panel, Defendants did not follow the requisite formal process for creating an advisory committee under the FACA.

98. Defendants' failure to provide notice in the Federal Register of the establishment of the Secret Panel constitutes a violation of the FACA.

99. Defendants' failure to provide notice in the Federal Register regarding establishment of the Secret Panel deprived Plaintiff and its members of the fair opportunity to be appointed to the Secret Panel.

100. Defendants' establishment of the Secret Panel constitutes final agency action.

101. Defendants' failure to provide proper notice regarding application and appointment of "subject matter" experts for "supplemental scientific analysis" of the DGAC Report constitutes agency action without observance of procedure required by law.

**PLAINTIFF'S SECOND CLAIM FOR RELIEF**
**(Violation of FACA via Unlawful Operation of Secret Panel; Agency Action Without Observance of Procedure Required by Law (APA § 706(2)(D)))**

102. Plaintiff realleges and incorporates by reference the preceding allegations.

103. Defendants did not comply with the FACA's public accountability and disclosure requirements in establishing the Secret Panel.

104. Defendants' failure to permit the public to nominate members to the Secret Panel contributed to the Secret Panel not being "fairly balanced in terms of the points of view represented," in violation of the FACA.

105. Defendants' failure to file an advisory committee charter prior to the Secret Panel taking action constitutes a violation of the FACA.

106. Defendants' decision to hold meetings of the Secret Panel without public access to those meetings or access to the records made available to or prepared for or by the panel constitutes a violation of the FACA.

107. Defendants' failure to comply with the FACA's public access and accountability provision violated Plaintiff's right of access to that information and limited

Plaintiff's ability to fulfill its mission of keeping its membership and the public informed of the ways in which industry interests impact the Dietary Guidelines.

108. Defendants' authorization of Secret Panel meetings prior to filing the requisite charter and without public access to those meetings or to the corresponding records constitutes final agency action.

109. Defendants' authorization of Secret Panel meetings without filing the requisite charter and without public access to those meetings or to the corresponding records constitutes agency action without observance of procedure required by law.

**PLAINTIFF'S THIRD CLAIM FOR RELIEF**
**(APA § 706(2)(A), Arbitrary and Capricious)**

110. Plaintiff realleges and incorporates by reference the preceding allegations.

111. Defendants handpicked a Secret Panel in which eight of the nine members had conflicts of interest.

112. Defendants' Secret Panel members also have relationships with organizations associated with Defendant USDA's checkoff programs, which are statutorily prohibited from "influencing governmental policy or action" such as the Dietary Guidelines.

113. The new Dietary Guidelines reflect the biases and advance the interests of the Secret Panel members, rather than serving the health of "the general public" "based on the preponderance of the scientific and medical knowledge[.]"

114. Defendants' establishment of a Secret Panel that was not "fairly balanced in terms of the points of view represented" constitutes a violation of the FACA. 5 U.S.C. § 1004.

115. Defendants' establishment of a Secret Panel that was not "fairly balanced in terms of the points of view represented" harmed Plaintiff by compelling the organization to expend scarce resources to accomplish Defendants' legally mandated duties to inform Americans of dietary steps to protect their health.

116. By handpicking a Secret Panel that was not "fairly balanced in terms of the points of view represented" Defendants compelled Plaintiff to expend resources to counter the resulting inappropriate influence in the new Dietary Guidelines.

117. Defendants' establishment of a Secret Panel that was not "fairly balanced in terms of the points of view represented" constitutes final agency action.

118. Defendants' establishment of a Secret Panel that was not "fairly balanced" to engage in a review of the FACA-compliant DGAC Report is arbitrary, capricious, and contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

## PLAINTIFF'S FOURTH CLAIM FOR RELIEF
**(APA § 706(1) / Mandamus, Unlawfully Withheld FACA Records)**

119. Plaintiff realleges and incorporates by reference the preceding allegations.

120. The Mandamus Act authorizes district courts to issue mandamus orders compelling federal officials to perform ministerial or non-discretionary duties. 28 U.S.C. § 1361.

121. Defendants selected the members of and established the Secret Panel.

122. Defendants relied on the Secret Panel as a source of collective advice or recommendations for the Dietary Guidelines.

123. The Secret Panel is not composed wholly of full-time or permanent part-time federal employees.

124. The Secret Panel declared certain conflicts of interest in its Foundation for the Guidelines.

125. Defendants' Secret Panel is a federal advisory committee subject to FACA.

126. Defendants' conduct in the Secret Panel's establishment and operation failed to comply with FACA's ministerial, non-discretionary duties to provide public access to meetings and to provide public access to the records made available to or prepared for or by the Secret Panel.

127. The facts concerning the establishment of the Secret Panel, the scope and control exercised by Defendants over the Secret Panel, the Secret Panel's meetings and deliberations, and any conflict-screening, recusal, or waiver documentation pertaining to the Secret Panel are uniquely within Defendants' possession.

**128.** Defendants' failure to publish notices, charters, meeting information, or records pertaining to the Secret Panel deprived Plaintiff and the public of information necessary to assess whether Defendants complied with related legal obligations.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendants' Secret Panel is an advisory committee subject to the FACA;

B. Declare that Defendants violated the FACA in establishing the Secret Panel;

C. Order Defendants to produce documents on which the Secret Panel relied or created as part of its operation;

D. Order Defendants to produce detailed minutes of the Secret Panel's meetings;

E. Enjoin Defendants from relying on the Secret Panel's Foundation for the Guidelines and Defendants' Dietary Guidelines in future agency decisions;

F. Order Defendants to withdraw the current Dietary Guidelines and publish new Dietary Guidelines that are the result of a FACA-compliant public process; and

G. Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Mark Kennedy

Mark Kennedy (Bar No. 493380)
PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE
5100 Wisconsin Avenue, NW, Suite 400
Washington, DC 20016
Attorney for Plaintiff
(202) 527-7315
(202) 527-7415 (fax)

/s/ Deborah Press

Deborah Press (Bar No. 219215)
PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE
5100 Wisconsin Avenue, NW, Suite 400
Washington, DC 20016
Attorney for Plaintiff
(202) 717-8675
(202) 527-7415 (fax)

Dated: August 19, 2026

*Pending Pro Hac Vice Motions*

*Corey Page (Cal. Bar #218789)*
*Matthew Hamity (Cal. Bar #303880)*
*Evans & Page*
*2912 Diamond Street #346*
*San Francisco CA 94131*
*(415) 896-5072*
*(415) 358-5855 (fax)*